## D. V. PURINGTON *et al.*

### *v.*

### GEORGE HINCHLIFF.

*Opinion filed December 20, 1905.*

1. TRADE AND COMMERCE—*a party unlawfully interfering with another's lawful business is liable for damages.* Any person or combination of persons who unlawfully, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business are liable in damages for loss willfully caused by such action.

2. SAME—*all parties to a conspiracy to injure the business of another are liable.* All parties to a conspiracy to ruin the business of another because he refuses to do some act against his will or judgment are liable for all the overt acts done pursuant to such conspiracy and for the resultant loss, whether they were active participants or not.

3. SAME—*when agreement not to use certain brick is illegal.* An agreement between a brick manufacturers' association, a builders' association and a bricklayers' union that they will not use, purchase or lay brick made by any person who had not subscribed to the rules of the builders' association, for the unlawful purpose of injuring the business of such persons, is illegal, and the parties thereto are liable in damages for all acts done in pursuance thereof resulting in loss to the boycotted persons.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. EDWARD P. VAIL, Judge, presiding.

This was an action on the case commenced in the circuit court of Cook county by George Hinchliff against D. V. Purington, William H. Weckler, Adam J. Weckler, Frederick LaBahn, Louis Reimer, Charles Harmes, William Schlake, P. J. Sexton, Edward T. Harland, J. C. Thompson and the Masons' and Builders' Association.

The substantial allegations of plaintiff's declaration, after various amendments, are: "That for six years prior to the committing of the grievances complained of, plaintiff was a manufacturer and dealer in bricks, and was the owner and possessed of certain lands and buildings at Hobart, Indiana, which were in use by him as such manufacturer, and which had been acquired and equipped for said business of manufacturing brick at an expenditure of $50,000; that during said period the plaintiff was engaged in the manufacture of brick and selling the same almost exclusively in Cook county, Illinois, and was in receipt of large profits, and especially from having a market for said brick in said Cook county; that during said time the Chicago Masons' and Builders' Association was a corporation in said Cook county, and had among its members about two-thirds of all persons and firms then engaged in said county in the business of constructing brick and mason work and in purchasing and obtaining supplies of brick to be used in said county; that the membership of said corporation comprised substantially all the responsible and reliable persons or firms engaged in the business aforesaid in said Cook county; that during said period the members of said association constructed ninety-five per cent of the brick and mason work in said county, and plaintiff made sales of substantially all of the brick of his manufac-

ture, and all that could be manufactured at his said plant, to members of said association, from which he derived profits of $10,000 per year; that the defendant J. C. Thompson is and was a member and president of said association; that during said period there was in said county a voluntary organization of individuals known as the Brick Manufacturers' Association of Chicago, comprising ninety-five per cent of the manufacturers of brick in said county; that the members of said association were manufacturers of and dealers in and sellers of brick in said county; that the defendants, D. V. Purington, William H. Weckler, Adam J. Weckler, Frederick W. LaBahn, Louis Reimer, P. J. Sexton, Edward T. Harland, Charles Harmes and William Schlake, were during said period, and still are, members of said association and engaged in the business of manufacturing and selling brick; that during said period there was in said county a voluntary association known as the Bricklayers' Union, comprising ninety-eight per cent of the competent bricklayers of said county; that while the plaintiff was lawfully conducting his business as a manufacturer of and dealer in brick, the defendants wrongfully and unlawfully conspiring, etc., to injure the plaintiff in his business and to deprive him of the legitimate profits thereof, wrongfully and corruptly conspired and agreed among themselves, and caused to be agreed by said Masons' and Builders' Association and the members thereof, that such members should not purchase, nor be permitted to purchase, any brick to be used by them, or any of them, from any person, firm or corporation except such as had subscribed to the rules and regulations of said Masons' and Builders' Association, to which said rules and regulations the plaintiff was under no obligations to subscribe; that said Bricklayers' Union wrongfully and corruptly took action assuming to bind and pledge its members not to handle or lay any brick manufactured by any person who had not subscribed to the rules and regulations of said Masons' and Builders' Association, which said action or

pledge was accepted and acted upon by the members of said union and defendants; that after the making of said agreements and pledges, and with the unlawful purpose of injuring, etc., the plaintiff's business and of preventing and precluding him from conducting his said business in Cook county with profit, the defendants procured persons to go to customers of plaintiff and to attend at the places where brick of the plaintiff were bought to be used in constructing buildings in said county, and then and there wrongfully represented to the said customers and said workmen employed to lay and work with brick of the plaintiff, that if said customers should purchase or said workmen use brick manufactured by plaintiff, such customers and workmen would be prevented from completing or proceeding with any building or structure upon which it was proposed to use the brick of plaintiff; that in furtherance of their unlawful conspiracy in that behalf the defendants have, by wrongful threats and the imposition of fines upon persons dealing in or using the brick of plaintiff in said county, prevented sundry customers of plaintiff from purchasing brick from plaintiff and from completing contracts in which such brick would have been used, and have prevented workmen from laying or using plaintiff's brick, and have made wrongful and malicious threats, whereby customers of plaintiff have been deterred from buying or using plaintiff's brick; that by means of said several agreements and said wrongful, unlawful and malicious acts and interference of the defendants and the aforesaid unlawful conspiracy in that behalf, the plaintiff has been wholly deprived of the sales of brick in said county which he otherwise would have had, and has been and is unable to dispose of and sell his brick in said county, and has lost and been deprived of divers large gains and profits, etc., and by means of the premises the business of the plaintiff has been greatly damaged and rendered less profitable and the value of his lands and buildings greatly depreciated, to the damage of the plaintiff in the sum of $100,000."

Plaintiff also filed a specific bill of particulars, in which he set forth various alleged acts of defendants in furtherance of the unlawful combination and conspiracy as above charged in the declaration.

The defendants filed their plea of not guilty, and upon a trial before the court and a jury a verdict was returned for $22,000. The suit was subsequently dismissed as to William Schlake and judgment rendered upon the verdict against the other defendants, all of whom except J. C. Thompson and the Masons' and Builders' Association perfected their appeal to the Appellate Court, where, after a *remittitur* of $7000, the judgment was affirmed as to all of the defendants except P. J. Sexton, who died pending the appeal. From this judgment of affirmance a further appeal has been prosecuted to this court.

GEORGE W. PLUMMER, and WHARTON PLUMMER, for appellants.

EDWIN F. ABBOTT, for appellee.

Mr. JUSTICE WILKIN delivered the opinion of the court:

Much space has been taken up by the appellants in their brief and argument in the discussion of the question whether or not the evidence shows that appellants were guilty of an unlawful conspiracy, as charged in the declaration; whether or not the plaintiff proved by the evidence that he was injured as a manufacturer and dealer in brick; whether or not the verdict is sustained by the evidence, and many other questions which are conclusively settled by the judgment of the Appellate Court. As is well understood, we have nothing to do with controverted questions of fact, hence our inquiry is limited to but few of the points discussed by counsel for appellants.

At the close of plaintiff's evidence, as well as at the close of all of the testimony offered at the trial, the court was

asked to instruct the jury to find for the defendants, which instructions were refused, thus raising the question whether there is any evidence in the record fairly tending to support the allegations of the declaration, and whether or not the allegations of the declaration, under the facts, are sufficient to charge defendants with an unlawful conspiracy to injure the business of appellee.

The Appellate Court recited the following facts as appearing from the evidence: "The negotiations between the Masons' and Builders' Association which led to the agreement complained of, began in December, 1897, with the appointment of a committee by the Brick Manufacturers' Association, which obtained the appointment of a committee of the Masons' and Builders' Association, and the two committees in conference formulated the agreement. This seems to have finally gone into effect prior to October 1, 1898. The resolution of the Masons' and Builders' Association adopted at the time of the appointment of its committee of conference, provided, *inter alia*, that 'whereas, the brick manufacturers now have an organization which takes in all of the brick manufacturers of Cook county and vicinity, and believing that it is established upon a sound and practical basis, and believing the system will control the price of brick in the future,' and that an agreement would 'greatly benefit and advance the interests of the Chicago Masons' and Builders' Association and will strengthen the Brick Manufacturers' Association as well,' therefore the committee be appointed, which was accordingly done; that the substantial provisions of the agreement thus made are, that the members of the Masons' and Builders' Association who sign the agreement agree to buy sewer, hollow and common brick only from such members of the Brick Manufacturers' Association as have signed the agreement and are in good standing in said association, and the members of the Brick Manufacturers' Association who sign the agreement agree to give to the members of the Masons' and Builders' Asso-

ciation signing the agreement and in good standing, a trade discount from the trade price of one dollar a thousand brick. On all brick sold to purchasers outside of the Masons' and Builders' Association the brick manufacturers agree to pay into their treasury one dollar a thousand, the fund thus created to be divided every six months equally, one-half to their own members who have signed and are faithful members of the Masons' and Builders' Association. There are provisions for enforcing the terms of the agreement by imposition of fines and penalties, and it was to take effect on and after April 1, 1898, within the limits of Cook county and north of the Joliet branch of the Michigan Central railroad in Lake county, Indiana; that there is evidence tending to show that the plaintiff was the principal competitor in Cook county of the members of the Brick Manufacturers' Association; that his plant had a capacity of from 50,000 to 60,000 bricks a day, or about 15,000,000 bricks per year; that it was well equipped with machinery and 'the clay was all right.' It appears that plaintiff was at one time a member of the Masons' and Builders' Association, and that he made efforts to secure admission to the Brick Manufacturers' Association without success. These associations and associates, the brick manufacturers, the masons and builders and the Bricklayers' Union, employed business agents and secret service men, whose business it was to see that the rules formulated to make effective the agreement between them were observed by their membership. There is evidence tending to show that after the agreement in question was in active force and operation the plaintiff's business began to be interfered with by these agents and secret service men; that contractors and owners who were purchasing and using plaintiff's brick were compelled to cease using them; that large orders and sales were canceled; that one owner was compelled to pay a fine to the Masons' and Builders' Association before being permitted to complete with plaintiff's brick a building which was under way; that workmen were directed

not to lay plaintiff's brick because he was not in the combination, and there is evidence of particular cases in which such interference occurred. In one case where, as the evidence tends to show, money had to be paid to the Masons' and Builders' Association for the privilege of using plaintiff's brick to complete a job then under way, in order to get the work completed, the association afterward returned the money when threatened with legal procedure. The plaintiff testifies that the result of the combination and consequent interference with his business was that his brick became 'absolutely worthless. There wasn't hardly a man in Chicago that would handle them. The workmen all belonged to the union, practically, and the hod carriers would not handle them or the bricklayers wouldn't lay them.' He testifies that he was called on by the secretary of the Masons' and Builders' Association, who told plaintiff 'that the joint committee of the master masons and the brick manufacturers' crowd had just had a joint session in the next room adjoining my office and had directed him to inform me that they requested me to sell no more brick in the city of Chicago or Evanston. I told him they must be wrong,—that it was equivalent to asking me to quit business. He said 'there is no mistake on my part; the committee have just adjourned and the members are still in the next room.' I said, 'Go back and tell them they are a bigger lot of fools than I thought they were,' and I made a similar request of them.''

We think the foregoing finding as to the facts is sustained by the proofs. The question of unlawful conspiracy to injure the business of another, and the necessary elements to constitute it, has been before this court on other occasions. Our Reports contain many well considered cases on the subject. No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss willfully caused by such interference will give the party injured a right of action for all damages sustained. All parties to a

conspiracy to ruin the business of another because of his re-
fusal to do some act against his will or judgment are liable
for all overt acts illegally done pursuant to such conspiracy
and for the subsequent loss, whether they were active partic-
ipants or not. (*Doremus* v. *Hennessy,* 176 Ill. 608; *O'Brien*
v. *People ex rel.* 216 id. 354.)   To the same effect see *Smith*
v. *People,* 25 Ill. 9; *Craft* v. *McConoughy,* 79 id. 346; *More*
v. *Bennett,* 140 id. 69; *Foss* v. *Cummings,* 149 id. 353;
*American Live Stock Commission Co.* v. *Live Stock Ex-
change,* 143 id. 210; *Harding* v. *American Glucose Co.* 182
id. 551; *Lasher* v. *Littell,* 202 id. 551; *Chicago, Wilming-
ton and Vermilion Coal Co.* v. *People,* 214 id. 421.   To the
same effect are the decisions of courts in other jurisdictions.
See cases cited in *Doremus* v. *Hennessy, supra,* on page 616.

Under the authorities above cited and in view of the
evidence as it appears in the record there is evidence fairly
tending to show that appellants were guilty of an unlawful
combination and conspiracy to maliciously injure the appel-
lee's business.   The court committed no reversible error in
refusing to instruct the jury to find for the defendants.

Complaint is also made of the rulings of the court in the
admission and exclusion of evidence and in giving and re-
fusing instructions.   All of these alleged errors are based
upon the theory that the appellants were not guilty of an un-
lawful combination and conspiracy.   In each instance the
evidence admitted tended to prove the allegations of the
declaration, and was therefore competent.   The instructions
given announced the law of conspiracy as held in the fore-
going decisions and those refused laid down a contrary rule.

We find no reversible error, and the judgment of the
Appellate Court will be affirmed.     *Judgment affirmed.*