## MALICIOUS INTERFERENCE IN BUSINESS MAY BE ENJOINED.

### Superior Court of Cincinnati.

LOUIS HELLMAN ET AL V. THE RETAIL FURNITURE SALESMEN'S
ASSOCIATION.

Decided, December 22, 1919.

*Trade Disputes—Interference with Business—Methods Which are in
Themselves Lawful or Unlawful—Malicious Interference—Coercive
Measures not Permissible, When.*

1. Malicious, interference with the right of plaintiffs to carry on their
business as may seem advisable to them, is a violation of plaintiff's
constitutional rights to liberty and property and as such may be
enjoined.

2. The existence of a trade dispute between the employer and employees
or the elements of competition, whether between similar businesses
or between capital and labor, will constitute a justification for
interference, by means in themselves lawful, without regard to the
existence of an intent to injure.

3. The fact that the defendants can not secure from *their* employers the
advantage of Saturday night closing unless plaintiffs close also,
will not justify the use of coercive measures to compel plaintiffs
to close on Saturday evening nor the bannering of plaintiff's place
of business as "unfair" where there is no trade dispute between
plaintiffs and their employees.

4. A combination to carry into effect such bannering of plaintiffs'
place of business and malicious interference with such business
is an illegal conspiracy and may be enjoined.

Memorandum of decision on motion for new trial.

HICKENLOOPER, J.

This cause comes up for hearing on motion of the defendants
for a new trial or, since the matter is in equity, for a re-hear-
ing and reconsideration by the court of the legal questions in-
volved in the previous decision of the court making permanent
the temporary restraining order issued against the defendant
association  This previous decision of the court was rendered
from the bench and involves the right of the defendant associa-
tion to picket the plaintiffs' place of business and exhibit in

front of such place of business a printed banner reading "Louis Hellman & Co. Unfair to Retail Furniture Salesmen's Association."

From the pleadings and the evidence adduced at the hearing it appears that the defendant association is composed of about 55 of the retail furniture salesmen in the city of Cincinnati and was organized for the purpose of promoting the welfare of all furniture salesmen in the city, of which there are probably some .400 or 500. Shortly after the organization of the association a movement was started to bring about the closing of the retail furniture stores on Saturday evening and thus enable the retail salesmen to spend that evening of the week at home with their families. A petition was circulated among the proprietors and an agreement was signed by practically all of such proprietors whereby each agreed to close his store on Saturday evening at 6 p. m., "provided all other retail stores in the city of Cincinnati closed." The plaintiffs, Louis Hellman & Company, refused to sign this agreement alleging that they employed no salesmen after 6 p. m. on Saturday evenings, but that the business of the partnership was conducted personally by the partners and the members of their families.

Upon this refusal of Hellman & Company to co-operate with the Salesmen's Association and with the avowed intention of coercing the plaintiffs into closing their store, since their refusal jeopardized the plan of universal closing, the defendant Association placed an employee in front of the plaintiffs' store bearing the banner above mentioned. There was evidence that the display of this banner had caused several customers, who had come to make payments upon their accounts, to leave the vicinity without entering, and the only conceivable purpose of displaying such a banner is the establishment of a direct, if not a secondary, boycott and, by injury to plaintiffs' business to compel their acquiescence in the demands of the Association.

On behalf of the plaintiffs it is contended that the acts shown constitute an illegal conspiracy and that a court of equity may and should enjoin the same. On behalf of the defendants it is earnestly contended that the constitutional provisions guaranteeing freedom of speech and ensuring to the defendants the right to the pursuit of happiness necessarily ensure the right in the defendants to state their case to the public and to take

all steps, lawful in themselves, which may result in bettering the condition of the members of their association; and if the business of the plaintiffs is injured by any such acts of the defendants, not in themselves unlawful, such injury is *damnum absque injuria*. The defendants further contend that in Ohio the existence of an intention to injure, or what is legally known as malice, can not make unlawful an act which is otherwise lawful, and that what an individual may lawfully do, does not become unlawful by reason of the fact that several have combined and agreed to act in unison. In other words, defendants contend that any act which an individual may lawfully do, he may request another to do and that he may secure from such others an agreement to this end. It is thus contended that if any one of the members of the defendant association may voluntarily abstain from patronizing the plaintiffs' business, by the same token they may agree together to abstain from such patronage and may request other individuals or the public at large, to abstain from such patronage, and that in so doing they violate no constitutional right of the plaintiffs.

At the very inception of the consideration of this case it must be noted that the same constitution of this State which, by Article I, Sec. 11, guarantees to the defendants the right to freely speak, write and publish their sentiments on all subjects, being responsible for the abuse of that right, likewise guarantees to the plaintiffs the inalienable right of acquiring, possessing and protecting property, and of seeking and obtaining happiness, which latter right includes the right so to conduct their lives and business as may seem to them advisable just so long as such acts upon their part do not infringe the rights of another. It would seem that the right of the plaintiffs to conduct their business in any manner that may seem to them proper should not be limited or abridged more than is necessary by a similar constitutional right in the defendants to freely speak and publish their sentiments upon any subject. If possible, these two inalienable rights of different individuals should so far be harmonized or construed in harmony as to allow the maximum of liberty and the minimum of abridgement or limitation to each. The one provision may not, and can not, be given effect without taking into consideration, and like wise giving effect to, the other. We start therefore with this as the basis and shall seek

to determine in what manner the interests of both may be protected.

It might also be noted, as preliminary to the main discussion, that the word "unfair" as displayed upon banners, has acquired a highly specialized meaning, viz., that the employer, before whose place of business it is displayed, is conducting a non-union shop, or that he has a dispute with his employees as to compensation or working conditions which has not been adjusted, or that a strike is then in progress at such establishment. Inasmuch as there is no strike nor any dispute between the plaintiffs and their employees as to working conditions or pay, the use of the word "unfair" in this particular instance might be enjoined as misleading. *Steinert & Sons Co.* v. *Tagen,* 207 Mass., 394. This point is not, however, made a basis for the decision of the instant case since the dispute has been submitted to the court, and argued by counsel solely upon the broader question above stated.

The almost universally accepted definition of a conspiracy is that given in Anderson's Law Dictionary, viz.: "A conspiracy is a combination of two or more persons by some concerted action to accomplish a criminal or unlawful purpose or to accomplish a purpose, not in itself criminal or unlawful, by criminal or unlawful means." And in *Lindsay* v. *Montana Federation of Labor,* 96 Pac., 127, this definition is quoted with the observation, in reference to boycott, that "it is the illegality of the purpose to be accomplished, or the illegal means used in furtherance of that purpose, which makes the act illegal." This court adopts the principle just stated as fundamentally sound and it shall therefore be our endeavor to determine whether the concerted action of the members of the defendant association, in which action they solicit the support and concurrence of the public in general, is either to accomplish a purpose, lawful, or even laudable, in itself by unlawful means; or to accomplish an illegal purpose by lawful means.

As above stated the avowed and only conceivable purpose of the defendants is to drive away customers from the plaintiffs' business and thus to introduce the element of coercion into their negotiations with the plaintiffs as to Saturday night closing. The question therefore resolves itself into a determination of whether this injury to the good will of plaintiffs' busi-

ness is an *unlawful* interference with and injury to a property right; for, if so, the combination becomes an illegal conspiracy whether the unlawful act be considered as the ultimate purpose or merely as a means for the accomplishment of a purpose not unlawful in itself, viz: the betterment of the working conditions of the members of the defendant association.

"The injury to the plaintiff is an essential element of the defendants' scheme, and whether the benefit to the defendants' members be considered as the end of the combination, and the injury to the plaintiff one of the means used, or whether the injury to the plaintiff be considered the end and the strike the means, the result is the same. The concerted action is an illegal conspiracy." *Albro J. Newton Co.* v. *Erickson* (1911), 126 N. Y. Supp., 949.

Having given the facts of this particular case and the authorities cited the most careful consideration the court has come to the conclusion that this combination to injure the plaintiffs' business is an illegal conspiracy; first, because it is an injury to one of plaintiffs' property rights, without justification; second, because it constitutes a restraint of trade; and third, because of the element of coercion which taints the whole transaction. We have also come to the conclusion that the wrong is one in respect to which a court of equity can and should afford a remedy by injunction and that the great weight of authority, both in England and in these United States, supports this conclusion. It is unnecessary to consider many of the authorities in detail, but in considering the general principles upon which our conclusions are based we shall cite and quote from enough of the cases to show the trend of modern judicial opinion upon the subject.

That the plaintiffs' right to carry on their business in any manner that seems best to them, just so long as they do not infringe upon the rights of others, is a constitutionally guaranteed property right, would seem to be so well established as to require the citation of no authority to support it. "It seems strange," says the court in *Loewe* v. *Cal. State Federation*, 139 Fed., 71, 79, "that in this state and this free country—a country in which the law interferes so little with the liberty of the individual—that it should be necessary to announce from

the bench that every man may carry on his business as he pleases; may do what he will with his own so long as he does nothing unlawful and acts with due regard to the rights of others." As was said also by Mr. Justice Hughes in *Truax* v. *Raich*, 239 U. S., 33: "It requires no argument to show that the right to work for a living in the common occupations of a community is the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure."

"A person's business, aside from the money, chattels, plant and other tangible property employed therein, is in every sense of the word property, and as such is if lawful, entitled to protection from all unlawful interference   *   *   *." *Martin's Modern Law of Labor Unions*, Sec. 84.

Citations upon this point might be multiplied indefinitely but suffice it to say that in the present case the court is clearly of the opinion that the right of the plaintiffs to carry on their business in such manner as seems to them most advisable, provided it is done in a lawful manner and does not infringe upon the rights of others, is a well established and fundamental right, partaking, as the court observes in *Coppage* v. *Kansas*, 236 U. S., 1, both of the nature of a right to personal liberty (the pursuit of happiness) and of a property right. If this be so, is it a right which the courts will protect against malicious interference by others? Or, expressed differently, can an interference with and injury to this right, without justification and maliciously, be considered lawful? If such malicious and unjustified action on the part of defendants is considered unlawful then their combination, as above remarked, is to be classed as an illegal conspiracy.

As already stated, it is contended by the defendants that since there were no assault and battery, nor disorder, nor breach of the peace, and in fact, no violation of any penal statute, libel nor misrepresentation, that therefore the injury to plaintiffs' business is simply the result of doing what they have a lawful right to do and, as such, partakes of the lawful character of the means employed. This is clearly fallacious. It loses sight of the distinction between the end and the means, the ultimate act and the intermediate acts. It may be entirely lawful for one to mix poison with food for the purpose of killing rats in

one's barn, but if that act be performed as a step in a conspiracy to poison another person, the ultimate poisoning does not become lawful because there was nothing intrinsically illegal in mixing poison with food. Nor are we entirely satisfied that this case at bar would not come within the provisions of General Code, Section 12477, making criminal the malicious destruction of the property of another. It is possible that the Legislature might be held to have had in mind only the malicious destruction of *tangible* property but this has never been judicially established in this state and the cases in Ohio, apparently holding that malice can not make illegal an act which one has a legal right to do, are not controlling upon this point. Thus *Letts* v. *Kessler*, 54 O. S., 73 (spite fence), can be distinguished upon the ground that, in Ohio, one has no property right in light and air from adjoining property; *Kelley* v. *Ohio Oil Co.*, 57 O. S., 327 (oil wells), upon the ground that, similarly, there is no property right in percolating water or oil; and in *Lancaster* v. *Hamburger*, 70 O. S., 156 (procuring the discharge of a conductor by reporting misconduct), there was either an absence of malice or a justification for the defendant's act which in itself was a defense upon the ground of public policy and negatived any actual malice which may have existed. But, whether Section 12477, of the General Code may be held to apply to the instant case or not, we are of the opinion that the criminal law of this state, and every other, is so rife with instances in which acts in themselves lawful enough become unlawful when done as steps toward the accomplishment of an ultimate unlawful purpose that no weight whatever can be given to the argument of the defendants that the ultimate injury to plaintiffs' business can not be enjoined, even though unlawful, because the means used were, in themselves, lawful. See *U. S.* v. *Debs et al*, 64 Fed., 724, 763:

"The rule is familiar in criminal jurisprudence that any act, however innocent in itself, becomes wrongful or criminal when done in furtherance of an unlawful design."

And *Gompers* v. *Buck Stove & Range Co.*, 221 U. S., 418:

"The court's protective and restraining powers extend to every device whereby property is irreparably damaged or com-

merce is illegally restrained. To hold that the restraint of trade under the Sherman Anti-Trust Act or on general principles of law could be enjoined, but that the means through which the restraints so accomplished could not be enjoined, would be to render the law impotent.''

We are of the opinion that both upon reason and authority a wholly unjustified and malicious attack upon the plaintiffs' business can not be said to be lawful even though interdicted by no express enactment of our criminal code.

''It needs no extended statement to make it manifest that the right to carry on a business without interference, without fraud, and without obstruction is one of the most valuable of all rights; indeed, in the commercial world, the right of greatest value is the right freely to carry on a lawful business, without unlawful interruption. It is a substantial right which may be protected by any remedy known to the court as fully as a constitutional or statutory right, and as fully as rights in ordinary forms of property.'' *Ry. Co.* v. *McConnell*, 82 Fed., 55, 68.

''No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business * * *. All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all other acts illegally done pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not.'' *Purington* v. *Hinchliff*, 76 N. E., 47.

''If the purposes of the undertaking complained of were purely and simply, or even primarily, interferences with the plaintiff in the control of its business as alleged, no act, however innocent in itself, directed to that end can be said to have a lawful purpose for its doing.'' *Tri-City Central Trades Council* v. *American Steel Foundries*. 238 Fed., 728.

''But where a labor union calls or threatens to call a strike of its members, not primarily for the lawful benefit or advantage of the union or of its members, but for an unlawful purpose—that is, one prohibited by law or which contravenes public policy, to the injury of another or others, then this action or threatened action if consummated will render it liable for damages, and if not consummated may be enjoined.'' *Grassi Contracting Co.* v. *Bennett*, 174 App. Div., 244 (N. Y.).

But, it is contended, this broad principle just stated, if carried to its logical conclusion, would make unlawful every strike because in every strike there exists the intention temporarily to injure the business of the employer and thus to enforce the de-

mands of the strikers as to pay or working conditions.  This contention loses sight of the fact that the court holds such malicious injury as unlawful only when without justification, while in the case of the ordinary strike such strike finds its justification, and consequent exception from the general rule, in the fact that there is a dispute between employer and employee.  It is the element of competition between capital and labor as to rate of pay and working conditions and the element of the existence of a trade dispute upon these questions that justifies the strike and we wish to express our complete concurrence in the language of the Court in *Pickett* v. *Walsh,* 192 *Mass.,* 572, where it is said:

"In our opinion organized labor's right of coercion and compulsion is limited to strikes against persons with whom the organization has a trade dispute."

This same idea is exemplified in the language of Judge Carter in the case of *Kemp* v. *Division No. 241, Amalgamated Society,* 99 N. E., 389 (Ill.):

"By the weight of authority and in accord with sound public policy, a sympathetic strike or boycott must be held unlawful and as not within the immediate field of competition.  Persons who have nothing to do with the trade dispute—non-combatants —can not be compelled by such means to take part in the struggle."

See, also, *Jonas Glass Co.* v. *Glass Blowers Assn.,* 72 N. J. Eq., 653, 663-4; *Thomas* v. *Cincinnati, etc., Ry. Co.,* 62 Fed., 803; and *Purvis* v. *Local No.* 500, 214 Pa., 348.

As to the contention that any individual may abstain from trading with the plaintiffs, whatever his motive and without responsibility for any injury to plaintiffs' business by reason of such abstinence, and that what one may lawfully do he may lawfully combine with others to accomplish and may request any one else to join him in doing, it is sufficient to say that such contention nullifies the whole law of conspiracy and is not, in the opinion of the court, sustained by either reason or authority.  In support of the principle that certain conduct lawful in one individual may become unlawful if done by a combination among several and may be enjoined, see the cases already cited herein and also *Quinn* v. *Leathem,* 1901 App. Cases (Eng),

.945; *Martell* v. *White*, 185 Mass., 255; *Mogul Steamship Co.* v. *McGregor*, L. R. 22 Q. B. D., 216; *Arthur* v. *Oakes*, 63 Fed., 210; *State* v. *Glidden*, 55 Conn., 75; *Hopkins* v. *Oxley Stave Co.*, 49 U. S., 259, 260, 261; *Union* v. *People*, 220 Ill., 355; *Bailey* v. *Master Plumbers*, 46 L. R. A., 561-6; *Cramp* v. *Commonwealth*, 84 Va, 929; *Brown* v. *Jacobs Co.*, 115 Ga., 426; *Erdman* v. *Mitchell*, 207 Pa. St., 79; and *Hamilton Brown Shoe Co.* v. *Saxey*, 131 Mo., 19.

Further, and as a second ground for making the injunction perpetual, the court considers the acts of the defendants as constituting an illegal restraint of trade and as such subject to injunction.

Sec. 6391, *et seq.*, of the General Code of Ohio define a trust as a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons, for any or all of the following purposes: 1. To create or carry out restrictions in trade or commerce, etc., and make such restraints illegal, and the prohibition of these sections of the General Code extends, as was said of Sec. 1 of the Sherman Act, in *U. S.* v. *Patten*, 222 U. S., 525, not only to voluntary restraints but to involuntary restraints as well, as where persons not engaged in commerce "conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce, or restrict the common liberty to engage therein." As is said by Chief Justice Erle in his work on Labor Unions, quoted with approval in the case of *Loewe* v. *Lawlor*, 208 U. S., at 295, "at common law every person has individually, and the public also has collectively, the right to require that the course of trade should be kept free from unreasonable obstruction." The principle underlying all the cases involving the question of conspiracy made effective through the violation of the Sherman Anti-Trust Law is to the effect that the plaintiff injured by reason of such conspiracy or boycott has a right to demand that trade be permitted to flow in its normal course unimpeded and undisturbed by the acts of the defendants and that public policy also demands this. Just as soon as the public is deprived of the benefit of full and free competition or the individual is deprived of the benefit of conducting his business in the manner which seems to him most

advisable, a restraint arises in normal trade conditions, which, if without justification, can not be said to be lawful.

In *Haverhill-Strand Theatre Co. v. Gillen et al,* L. R. A., 1918-C, 813, the court says:

"A combination which interferes with the plaintiff's right to a free flow of labor is legal if the purpose for which it is made justified the interference with that right. On the other hand, it is illegal if that purpose does not justify the interference."

And in *Eastern States R. L. D. Assn. v. U. S.,* 234 U. S., 600, 612-13, the court in speaking of the circulation of a "do not patronize" list, says:

"In other words the trade of the wholesaler with strangers was directly affected, not because of any supposed wrong which he had done to them, but because of a grievance of one of the association, who had reported a wrong to himself, which grievance, when brought to the attention of others, it was hoped would deter them from dealing with the offending party. This practice (the circulation of black lists) takes the case out of those normal and usual agreements in aid of trade and commerce which may be found not to be within the act and puts it within the prohibited class of undue and unreasonable restraints, such as was the particular subject of condemnation in *Loewe v. Lawlor,* 208 U. S., 274."

In the present case we think the purpose in displaying the banner was the same as the purpose of the defendants in the case just cited, in circulating the so-called black lists; and the effect in diverting trade from its normal channels was the same. The restraint was not as marked but it was a restraint and therefore an interference with the right in the plaintiffs, and the public, to have trade wholly free. Quoting again from *Loewe v. Lawlor,* 208 U. S., 274:

"The act (the Sherman Act) prohibits any combination whatever to secure action which essentially obstructs the free flow of commerce between states, or *restricts in that regard the liberty of the trader to engage in business.*

The combination charged falls within the class of restraint of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of trade except on conditions that the combination imposes. * * * "

We are of the opinion that the same principle applies to intra-

state trade under the Ohio anti-trust law as has been so frequently applied to inter-state commerce under the Sherman Act.

Lastly, there is a distinct element of coercion apparent in all the acts and actions of the defendants, not only as directed against the plaintiffs but also as directed against the plaintiffs' customers. It is clearly apparent that not only is the banner sought to be displayed for the purpose of coercing the plaintiffs into doing that which they have a clear legal right to abstain from doing, but also for the purpose of diverting from their business the trade of union customers and their families, not voluntarily, but through some fear of complications with the unions to which such customers might belong if they did not abstain from trading with the plaintiffs. It has been said that "freedom of the will not inconsistent with the rights of others is the very foundation of liberty" and that "in such a case, reason and not coercion is the only remedy that justice prescribes." (*Park* v. *Hotel & R. Emp. Int. Alliance,* Ohio Law Bulletin, July 14, 1919) and that "the liberty of a man's mind and will, to say how he shall bestow himself, his means, his talents and his industry, is as much a 'subject of the law's protection as is that of his body" (Lord Brampton in *Quinn* v. *Leathem, supra.*) Nor is it necessary that the fear constituting the intimidation and coercion should be the fear of physical injury. nor need such fear be abject.

"The clear weight of authority undoubtedly is that a man may be intimidated into doing, or refraining from doing, by fear of loss of business, property or reputation, as well as by dread of loss of life, or injury to health or limb; and the extent of this fear need not be abject but only such as to overcome his judgment, or induce him not to do or to do that which otherwise he would have done or left undone." *Judge Taft in Toledo A. A. & N. M. Ry. Co.* v. *Penna. Co,* 54 Fed., 760.

And see also *Plant* v. *Woods,* 176 Mass., 492.

Clearly, where the intimidation is exercised toward the plaintiffs' customers so as to preclude the free exercise of their will power, the combination becomes unlawful and it would also seem to the court that where the coercion and intimidation is exercised toward the plaintiffs alone, without any justification whatever, such exercise of coercion would make the whole combination illegal even though there was no actual loss of business. The use of

such unjustifiable force would, in a way, taint the whole proceeding and justify the intervention of a court of equity. "The law should afford protection against the efforts of powerful combinations to rob him of that right (to conduct his business as he pleases) and coerce his will by intimidating his customers and destroying his patronage." *Hamilton Brown Shoe Co.* v. *Saxey,* 131, No. 19.

A case almost identical as to facts with the one now before the court, but considered solely from the viewpoint of a plaintiff's right to injunction against bannering his theatre where the sole dispute was as to the plaintiff's right, as an employer, to operate one of the moving picture machines, is the case of *Roraback* v. *Motion Picture Mach. Opp. Union, et al,* 140 Minn., 481, 3. A. L. R., 1290, where the right to injunction was sustained upon the principle that every man had a constitutional right to work in his own business. This case is instructive if, in the instant case, we consider the rights of the plaintiffs from the similar viewpoint of their right to *personally* conduct their business on Saturday nights without the services of any regular employees, as the evidence shows was their practice.

For these reasons the court is of the opinion that the injunction heretofore granted should be made perpetual.

*Harry Hess,* for plaintiffs.
*Samuel I. Lipp,* for defendants.